Filed 4/3/14  P. v. Johnson CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B243937 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA085835) |
| v. | |
| FRANKIE RENO JOHNSON et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Laura F. Priver, Judge.  Reversed.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant Frankie Reno Johnson.

Joy A. Maulitz, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Lamar Vance.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Herbert S. Tetef, Deputy Attorney General, for Plaintiff and Respondent.

_____

Frankie Reno Johnson and Anthony Lamar Vance appeal from the judgments entered following a jury trial in which they were convicted of second degree robbery with gang and firearm use findings.

Defendants contend the trial court erred by denying their motion to bifurcate trial of the gang enhancement allegation. We agree and conclude the error prejudiced both defendants. The gang evidence had little or no relevance to the robbery charge, but it posed an extreme risk of undue prejudice. Admission of such extensive and prejudicial evidence violated defendants' due process rights to a fair trial. Given weaknesses in the victim's identification of defendants and expert testimony identifying circumstances suggesting her identification may have been inaccurate, a unitary trial cannot be said to have been harmless beyond a reasonable doubt.

Defendants also contend the evidence was insufficient to support the gang enhancement finding. We agree. There was no substantial evidence the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang.

Johnson further contends the trial court abused its discretion by denying his request not to impose the gang enhancement. Our reversal of the gang enhancement moots this issue.

Finally, Johnson contends, and the Attorney General concedes, he is entitled to one additional day of presentence credit for actual custody. Our reversal of the robbery convictions moots this issue. If Johnson is retried and again convicted, the trial court will be required to recalculate his credits and can correct the error at that time.

**BACKGROUND**

1.      **The robbery**

About 11:40 a.m. on October 24, 2011, Olga Sogomonyan parked her car in the driveway of her Glendale home. She noticed two African-American men wearing black hooded sweatshirts walking up the street. She thought this was odd because it was a warm day. Sogomonyan got out of her car and walked around to the passenger side to

2

pick up a file folder and a tray of coffee from the floor of her car. When she stood up and turned around, the two men were standing in front of her. One of them, who had the hood of his sweatshirt pulled over his head, was aiming a gun at Sogomonyan's forehead. Sogomonyan identified this man at trial as defendant Johnson and provided a detailed description of the gun. Sogomonyan identified the second man, who was wearing a "do-rag," as defendant Vance. Johnson demanded Sogomonyan's jewelry, but she froze. Johnson yanked a five-and-one-half carat diamond and gold pendant from her neck and put it into his sweatshirt pocket. She was also wearing "a very expensive ring," a diamond tennis bracelet, a watch, and a second ring. One of the men ordered her to take off her jewelry, but she did not comply and they did not attempt to take any other jewelry from her.

Vance asked what was in Sogomonyan's purse. She said she had nothing. The men told her to sit in her car. She complied. Johnson took the mobile phone she was holding and they walked away in the direction from which they had arrived. At the preliminary hearing, Sogomonyan testified the men took her phone before they told her to sit in the car. At trial, Sogomonyan was confronted with this testimony and insisted her phone was taken after she was seated in her car.

Sogomonyan ran inside her house and phoned the police, who arrived in less than five minutes.

## 2. Investigation

Glendale Police Officer Jose Arriaga responded to Sogomonyan's house. She described the robbers and their attire, which Arriaga broadcast. She told Arriaga both robbers were 24 to 27 years old. She described the gunman as having a medium build, with dark eyes and some facial hair. She said the other robber was wearing a do-rag and had a slim nose and no facial hair.

Glendale Police Officer Conrad Austin and his partner also responded to Sogomonyan's house, then went out in their patrol car to search the area for possible suspects. When they were on the street intersecting Sogomonyan's street, a woman

3

drove up alongside them and spoke to them. She seemed concerned and excited, gave them a description of a vehicle, and pointed at a sign posted at the intersection.[1] The officers went to look at the sign and saw what appeared to be a license plate number, except it had one too many numerals and one too few letters. They checked it as written and received no results. They then substituted a "Z" for a "7" and found a registration for a vehicle that matched the description given by the woman.

Glendale Detective Andrew Jenks testified that the registered owner of the car with the license plate Austin checked was Aghavni Grigoryan, and the address on the registration was a house in North Hollywood where Grigoryan lived with her husband Aram Melkonyan and his brother Arakel. On January 18, 2012, Jenks went to the house and spoke to Arakel, who said his brother was the primary driver of the vehicle. Jenks had the vehicle impounded, then searched it pursuant to a warrant. The vehicle, a white Infiniti SUV, contained a stun gun, a canister of pepper spray, and a large bucket containing stockings, hair extensions, a knit cap, and zip ties, some of which were looped together in the form of handcuffs. It also contained a note that seemed to reveal details of a robbery. It included "'disguise hats makeup hair bandage,'" "'tie them up and move to bathroom,'" and "'two got shotgun on them. Three clerks.'" Aram Melkonyan's fingerprint was found on the note. Vance's fingerprint was found on a Pepsi can in the car.

The identification of Vance's fingerprint caused Jenks to investigate Vance, which led Jenks to suspect Johnson as well.

---

[1] Following a pretrial Evidence Code section 402 hearing, the trial court precluded Austin from testifying to the woman's statements and excluded some of the contents of the sign itself. However, Austin exceeded the scope of one of the prosecutor's questions and testified the woman "told us she posted a sign." Defendants objected, but the court allowed the testimony "for the limited purpose so not for the truth of the matter, ladies and gentlemen. I'll allow that statement for the limited purpose to explain the officer's subsequent actions so for that limited purpose only I'll allow it."

### 3. Sogomonyan's identification of defendants

On February 2, 2012, Jenks showed Sogomonyan a group of eight loose photographs that included photographs of Johnson (fifth photo) and Vance (third photo). Sogomonyan selected the photos of Johnson and Vance. Sogomonyan testified at trial she selected Vance's photo "[b]ecause that was the gentleman who was wearing the do rag and I recognized him." She selected Johnson's photo because "[t]hat's the guy who looked like the gunman." She explained, "When I came across these two photos I was a hundred percent and I told 'em I said 'Well they do look like those guys' but I even thought that maybe well God I don't want to be wrong and you know, I don't want to be, because it's a situation where it traumatically affects you so I went over the photos for maybe like 5 or 10 minutes. [¶] And he asked me 'Are you sure these are the guys?' [¶] And I said, 'You know, I am, um, almost certain that these are the guys.'" The prosecutor asked Sogomonyan whether she told the detective "these two photos looked like the two guys but" she did not think it was them. Sogomonyan replied, "I like I said the five minutes I was looking through the photos and it just you know—I had to keep on looking at them and at one time I said 'they look like the guys. It can possibly not be them but they look like those guys' and I ruled out all the other pictures and these are the two pictures that were, you know, clearly in my memory, the facial structure and the eyes and the nose and like I said, the lips."

Sogomonyan testified that she had an independent recollection of Johnson being the robber with a gun and she had no doubt it was him. She also testified that she had no doubt that Vance was "there with Mr. Johnson that day." She explained that seeing the men in court was different than seeing them in photos: "You know, photos are—when you see a person—when you see a person in person it's a completely different memory, completely different feeling and you can't forget a face once you see it. [¶] Photos are different. And also looking at them there is no doubt in my mind these are the guys because they were standing in front of me, daylight, and I remember everything about them."

5

An audio recording of the identification procedure and Jenks's interview with Sogomonyan was played at trial. As she went through the photographs, she said, "[O]ne of them actually looked like him." She continued, "I don't think that's him, but he looked like him." Jenks asked, "[W]hat do you remember that looked like him?" She responded, "Um, he was as dark as he is." She then described the nose depicted in the photo as "[m]iniature" and similar to the robber's. After Jenks and Sogomonyan discussed the facts of the crime, Jenks directed Sogomonyan's attention to photograph number 3, depicting Vance. Sogomonyan said, "Number 3. He looks a lot like him." She added, "If he was wearing a do-rag, I am telling you, it's so vivid in my—"

Sogomonyan then addressed identification of the gunman. She said, "So it's between, like, these two guys that have, like a little similarity that, um—" She continued, "Yeah. Not even this one so much because—maybe this one." The detective asked, "So you think possibly number 5?" She responded, "Yeah. Possibly 5 and 3." The detective asked her if she thought "these actually possibly could be" the culprits, and she said "Yes" and "They look like them." She reiterated, "They look like these two guys, especially this one," then explained, "Because he was dark, like, like this dark." She said she remembered the robber's face and nose, and "his nose was not, like, really big, you know," "it was, like, miniature." She indicated one of the photos and said it "really stands out." The detective said, "So you remember him." She responded, "Yeah. I don't think it's these guys, but they look like them."

Sogomonyan asked Jenks if she could take the photos with her. After he said she could not, she asked, "[A]re these people that, uh, generally, like, were involved in, uh, robberies in this area?" She then offered to look at "the whole album" and said, "[Y]ou know, once that face comes to me and it'll, it'll—like I'll recognize him."

After the audio recording was played at trial, Sogomonyan testified that when she identified Vance's photo, she was confident about her identification. Asked to explain her statement on the recording that she did not think the two men in the photographs she selected actually were the robbers, Sogomonyan testified, "Um there's—when you see a

6

person in person, because I looked at the pictures and pictures are different and what way because there was the hairline wasn't showing. It was I guess not—I don't know how to put it but from what I remembered because the hairline was covered and because there was a hood and because there was a do rag and looking at the pictures and this is, you know, the pictures do not have the do rag or the hoodie. [¶] So you're actually you're I—you're exposed to seeing hair and exposed to seeing some of the things you haven't seen originally. That's the reason why I, you know, I was certain but I wanted to make sure by seeing more and that's the reason why I made that statement."

Sogomonyan testified she had also identified the defendants at the preliminary hearing and explained her level of confidence: "I—a hundred percent. Once you see a face and once you experience that type of trauma it never goes away. It's something that, you know, I have sometimes I have dreams, you know, of the—of what happened to me so it's something that always comes to me. It always—sometimes gives me nightmares." She admitted, however, that she was sitting in the courtroom when the defendants were brought in for the preliminary hearing and she knew "who was supposed to be coming into the courtroom at that time." When asked what went through her mind when she saw them enter the courtroom, she replied, "It's a terrifying feeling so once you experience something like that and then you know you have that fear um and then when you see the person or the persons again it's an undescribable feeling. [¶] I mean, I'm a hundred percent sure."

### 4. Phone records linking defendants to one another and Melkonyan

The prosecutor introduced testimony and subpoenaed mobile phone records to demonstrate a relationship among Johnson, Vance, and Melkonyan.

The custodian of records for MetroPCS testified and produced records pertaining to two mobile phone numbers. The first number belonged to a subscriber named "Jankie Frankie." The prosecutor theorized this phone belonged to Johnson, whose first name is Frankie, and whose moniker, according to the prosecution's gang expert, was "Jankie." The second number belonged to a subscriber named Lakeisha Thomas. The prosecutor

introduced a photograph of a "Lakeisha" tattoo on the back of Vance's neck and theorized Vance shared this phone with Lakeisha Thomas and others.

The custodian of records for Sprint Nextel also testified and produced records for a mobile phone number belonging to a subscriber named Adam Melkon. Jenks identified that phone number as Melkonyan's. The custodian testified that on October 24, 2011, there were calls between Melkonyan's phone and the phone numbers the prosecutor associated with Johnson and Vance.

The Sprint Nextel custodian of records also testified regarding the locations of cell towers through which calls to or from Melkonyan's phone were transmitted on the morning of October 24, 2011. At 8:25 a.m. a call was transmitted through a tower on Western Avenue in Los Angeles. At 9:34 a.m. a call was transmitted through a tower on Van Nuys Boulevard in Pacoima. At 11:42 a.m. a call was transmitted through a tower on Wilson Terrace in Glendale. At 11:50 a.m. a call was transmitted through a tower on Grandview Avenue in Glendale. The next call was transmitted through a tower in North Hollywood, and the one after that through a tower in downtown Los Angeles.

The MetroPCS custodian of records testified cell towers in a populated area such as Los Angeles typically have a 1.5 mile range. A call using different towers throughout its duration suggests the phone is travelling. At 9:54 a.m. on the morning of October 24, 2011, a call on "Jankie Frankie's" phone was transmitted through a cell tower on Havenhurst in Van Nuys. A 10:59 a.m. call was first transmitted through a tower on Roscoe Boulevard in Panorama City and later through a tower on Saticoy in North Hollywood. An 11:47 a.m. call was transmitted through a tower on North Glendale Boulevard in Glendale. An 11:50 a.m. call was initially transmitted through a tower on Grandview Avenue in Glendale, then through a tower on Flower Street in Glendale.

Among the thousands of text messages sent or received by "Jankie Frankie's" phone between October 1, 2011, and February 15, 2012, there were numerous messages sent by, and a few sent to, Melkonyan. None of these was on October 24, 2011, or mentioned plans for that date or anything that happened on that date. The last message

8

between Melkonyan and "Jankie Frankie" before October 24, 2011, was one Melkonyan sent on October 21, 2011, that stated, "Right behind you." On the morning of October 25, 2011, Melkonyan sent a text stating, "We are a go for today. Ill be out in a bit." That night, Melkonyan sent a text saying, "Ask for tomorrow and thursday availabilities." Some of Melkonyan's messages referred to "T d," which may have been a reference to Vance, whose moniker, according to the prosecution's gang expert, was "Tiny Dark."

Among the thousands of text messages sent or received by Thomas's phone between October 1, 2011, and February 15, 2012, there were a few messages sent by or to Melkonyan. The earliest of these was on the morning of November 29, 2011.

There were also numerous text messages sent between "Jankie Frankie's" phone and Thomas's phone, although none between the early evening of October 20, 2011, and the late afternoon of October 24, 2011, and none mentioning a robbery or a plan for October 24, 2011. At 5:26 p.m. on October 24, 2011, "Jankie Frankie" received the following text from Thomas's phone: "nigga i got the spot cuhz lets get the shit done at the mall i just got the information homie u got the whip nigga."

**5.    Gang expert's testimony**

Los Angeles Police Department Officer Brent Williams testified as the prosecution's gang expert. His departmental assignment was to monitor the Rollin' 40's Crips, a primarily African-American gang with about 550 documented members. The gang claims a territory bounded by Martin Luther King Boulevard, 49th Street, Crenshaw Boulevard, and Figueroa. Williams testified the primary activities of the Rollin' 40's Crips gang are robberies, burglaries, and narcotics sales because they want to make and spend money as fast as they can. He testified, "Money is the most significant thing with these young guys coming up these days." Members of the gang also commit murders, attempted murders, assaults with deadly weapons, and witness intimidation.

Williams testified gang members usually commit violent crimes in pairs or larger groups to divide up the labor and have witnesses who can verify to other gang members that they committed the crime, which helps the perpetrators gain respect and rise within

9

the ranks of the gang. He further testified gang members relinquish the proceeds of a lucrative crime to their gang or use them to buy narcotics to share or to sell to make even more money, which they spend "as fast as they illegally take it and make it." He explained, "These guys party hard. They go to Vegas, out of state. They pay for hotel rooms to take their girls they meet."

Williams further testified that members of a community hear about crimes committed within that community by a gang, they fear the gang, and they refuse to cooperate with police investigating those crimes. This benefits the gang.

Williams testified he knew of instances in which gang members had committed crimes outside their own territory. It was becoming increasingly common for gang members to leave their own area and go into affluent areas to commit crimes "because there is more profit" in it.

Williams had never met either defendant, but another gang officer told Williams he had stopped Vance once and a third gang officer told Williams he had served Vance with an injunction targeting members of the Rollin' 40's Crips gang. Williams reviewed photographs of Vance's tattoos and testified several of them reflected membership in the Rollin' 40's Crips gang: a four-leaf clover on his neck, "4" on one tricep and "0" on the other, and "D on one bicep and "S" on the other, which Williams testified represented the Dark Side clique of the gang. Williams testified that another tattoo depicted a "gangster holding a gun in his right hand" and "a money bag" in his left hand, with "a four zero on the belt" and "'Gimme money' tattooed below the pants." Williams then testified, "This particular character is like a goon, a goon squad, these guys 'What are you?' [¶] 'I'm a goon' meaning they go out and cruise. Usually they are known for robbing and stealing. That's what this indicates to me that he's affiliated that with that type of criminal activity."

Williams testified that he was "familiar with" Johnson's membership in the Dark Side clique of the Rollin' 40's Crips gang. Johnson also had a four-leaf clover tattoo on his neck, a tattoo on the side of his torso that included "DS 40," and a "DS" tattoo.

10

Williams opined these tattoos demonstrated allegiance to the gang. Williams noted, "The tattoos are permanent. They are a permanent gang member."

In response to a hypothetical question based upon the prosecution's evidence, Williams opined the crime would have been committed "in association with" a criminal street gang "because you have two individuals from the same gang linking up to do a crime." He agreed with the prosecutor when she asked, "So the fact the two gang members of the same gang committed the crime together means they are obviously associating with one another?"

Williams also opined the crime would benefit the gang and explained, "Because these individuals they're gonna get respect and it heightens their reputation within the gang when they commit crimes such as this, violent crimes you know, using weapons, to instill fear into your everyday citizen." Williams then theorized that such a crime in "a smaller town or city" would result in "publish[ing] something in the newspaper or be breaking news possibly so that would also benefit the gang because you have written journalists['] documentation showing of a heinous crime that they can brag about and gain more respect from too." After the prosecutor focused Williams on the value of the necklace taken, he testified, "If the necklace was sold or traded it would benefit the gang because they could buy weapons or drugs for the gang and in turn use those to make more money."

On cross-examination, Williams testified that gang members sometimes commit crimes for their own personal benefit.

Williams also testified regarding convictions of other Rollin' 40's gang members to attempt to establish a pattern of criminal gang activity, an element of the gang enhancement. One of these predicate convictions was for two counts of attempted murder and entailed one member of the Rollin' 40's gang shooting another Rollin' 40's gang member and the brother of a third Rollin' 40's gang member as the result of "an incident" pertaining to "a Rollin' 40 gang location narcotics location where they sell dope from." The other predicate offenses were robbery and witness intimidation. In that

11

case, two members of the Rollin' 40's gang robbed a businessman who was friendly toward the gang and allowed gang members to congregate at his business and use its address for parole purposes. Williams testified, "By doing that, by robbing someone who actually was helping out the gang by letting people use address and hang out to the gang members that's crazy, that's like wow those guys are going for theirs, they gain respect within the gang[] you know."

**6.    Defense eyewitness identification expert's testimony**

Dr. Kathy Pezdek, a psychology professor specializing in research regarding cognitive identification, testified regarding factors affecting the accuracy of eyewitness identification. These include exposure time; positioning and distance; lighting; distraction, including the need to divide attention between multiple perpetrators; weapon focus, a form of distraction that is maximized when the weapon is shown at the outset; disguise, including anything covering the hair; whether the observer and person to be identified are of different races; time delay between the observation and the identification procedure; observation under high stress; the fairness of an identification procedure; and the bias inherent in an in-court identification.

With respect to the fairness of an identification procedure, Pezdek testified two suspects should never be placed in the same "lineup" and the officer administering the lineup should not know who the suspects are to avoid influencing the witness.

In-court identifications are inherently biased because it is obvious to the witness who is charged and it is easy for the witness to choose whom to identify. "Source monitoring error"—confusing the source of familiarity—also comes into play. Pezdek testified, "[I]n court when she looks at the defendants they are looking familiar to her because she saw them in the photographic lineup. So in other words the people she's looking at in court do seem familiar but she's confusing the source of the familiarity."

Pezdek also testified there is little correlation between a witness's degree of confidence and the accuracy of the witness's identification. Confidence in an identification early on is slightly more predictive of accuracy than later confidence, and

late expression of confidence may be attributable to source monitoring error. She testified, "[W]itnesses who are repeatedly shown the same person over and over again and asked to make an identification just repeating the same faces in photographic lineups, preliminary hearings and at the trial alone is enough to increase a witness's confidence" without regard to accuracy.

Pezdek further testified that a life-threatening situation causes the body to release adrenaline, corsitol, and other hormones that "stifle[] memory." Accordingly, memory is much worse than in a more relaxed situation. She further testified that memory fades over time, and the accuracy of identification thus decreases over time.

### 7. Verdict and sentence

The jury convicted defendants of second degree robbery and found the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members (Pen. Code, § 186.22, subd. (b)(1)(C)). [2] The jury further found Johnson personally used a gun in the commission of the offense (§ 12022.53, subd. (b)) and, with respect to both defendants, a principal personally used a gun in the commission of the offense (§ 12022.53, subds. (b), (e)(1)).

The court sentenced Johnson to 22 years in prison, consisting of 2 years for robbery, 10 years for the gang enhancement, and 10 years for the gun enhancement.

The court sentenced Vance to 13 years in prison, consisting of 3 years for robbery and 10 years for the gang enhancement. The court stayed the gun enhancement pursuant to section 654.

### DISCUSSION

### 1. The trial court erred by refusing to bifurcate trial of the gang enhancement

Before trial, Johnson filed a motion to bifurcate trial of the gang enhancement allegation. Vance joined in the motion. The motion explained that although the

---

[2] Undesignated statutory references are to the Penal Code.

defendants were "allegedly affiliated with the Rolling 40's gang, a South Los Angeles criminal street gang," the crime occurred in Glendale, the victim and the "third Co-Defendant," Melkonyan,[3] were not gang members, "[t]he incident itself, and the actions of the alleged participants have no gang-related overtones. The incident did not occur in a gang occupied area, but rather in a completely different city from the gang's territory." The motion argued admission of gang evidence to support the gang enhancement allegation would be "extraordinarily prejudicial if presented during the trial of the substantive charges" and deny defendants a fair trial of the charges because it would create improper propensity inferences through the introduction of evidence of prior crimes to support the primary activities and pattern of criminal gang activity elements of the enhancement and testimony about the culture and habits of gangs, including violence, intimidation, and sophistication.

In contrast, defendants argued, there was no evidence of any "gang-related motive or intent behind the commission of the robbery." In particular, there was no evidence the robbers mentioned a gang, used gang hand signs, bragged about the crime to other gang members, or provided funds from the stolen property to the gang. They argued, "There is no evidence that the robbery was anything but a personal endeavor. The gang officer's opinion . . . will be based solely on speculation, not on any substantive fact."

The prosecutor opposed bifurcation, arguing the crime benefited the gang because "whatever they obtain through this particular robbery is obviously going back to the gang," and the defendants would benefit by rising in the gang's ranks. She also asserted that the necklace stolen in the charged offense was not given to Melkonyan.

The trial court denied the motion, saying, "[T]his is one of those things that's within the discretion of the court and I think it would be more prejudicial if that third person was here. Since that third person is not a gang member it would be more prejudicial to him. I'm not saying the gang evidence isn't prejudicial but I do think that it

---

[3] The Information did not name Melkonyan, although the parties sometimes

14

does help the People explain why they were in another place and why they were committing the crime other than for personal gain.  It could be but that's up to the jury to decide.  [¶]  Deny the request to bifurcate the gang evidence and allow the People to try the case as they see fit.  Balancing under 352 so that will be the court's ruling."

Defendants contend the trial court abused its discretion and violated due process by refusing to bifurcate trial of the gang enhancement.  They argue the resulting admission of gang evidence was impermissibly prejudicial.

a.      **Principles regarding bifurcation of trial of gang enhancement allegation**

A trial court has discretion to bifurcate the trial of a gang enhancement from the trial of substantive offenses.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048–1049 (*Hernandez*).)  Generally, there is less need to bifurcate trial of a gang enhancement allegation than trial of a prior conviction allegation because a gang enhancement is "attached to the charged offense and is, by definition, inextricably intertwined with that offense."  (*Id.* at p. 1048.)  However, "The predicate offenses offered to establish a 'pattern of criminal gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation.  Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt."  (*Id.* at p. 1049.)

Where the gang evidence is "relevant to, and admissible regarding, the charged offense" there is no need to bifurcate, "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself."  (*Hernandez, supra*, 33 Cal.4th at pp. 1049–1050.)  The defendant must "'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'"  (*Id.* at p. 1051.)

---

referred to him, outside the presence of the jury, as a codefendant in the case.

The trial court's decision on a motion to bifurcate is reviewed for abuse of discretion. (*Hernandez, supra*, 33 Cal.4th at p. 1050.) The trial court's discretion to deny bifurcation of a gang enhancement is broader than its discretion to admit gang evidence when no enhancement is charged. (*Ibid.*)

**b.    Principles regarding admission of gang evidence**

Evidence of gang affiliation and activity is admissible where it is relevant to an issue such as motive, intent, or the truth of a gang enhancement allegation. (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Gardeley* (1996) 14 Cal.4th 605, 619–620.) But the trial court must carefully scrutinize such evidence because it may tend to inflame the jury. (*Williams*, at p. 193.) Evidence the defendant is a gang member creates a risk that the jury will improperly infer the defendant has criminal propensities, acted in accordance with such propensities, and is thus guilty of the charged offense. (*Ibid.*) Due to these potential dangers, gang evidence is admissible only if its probative value is not substantially outweighed by the risk of undue prejudice, relevant in a criminal trial. (*Id.* at p. 193; Evid. Code, § 352.) "'The word gang . . . connotes opprobrious implications . . . [and] takes on a sinister meaning when it is associated with activities.' [Citation.] Given its highly inflammatory impact, the California Supreme Court has condemned the introduction of such evidence if it is only *tangentially* relevant to the charged offenses. [Citation.]'" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*).)

**c.    The trial court erred by refusing to bifurcate**

Here, the gang evidence had, at most, tangential relevance to the robbery charge and, to the extent it was relevant, the same purpose could have been achieved without resort to gang evidence. The motive for the robbery was self-evident: pecuniary gain. No evidence indicated defendants shared the proceeds of the robbery with the gang, but even if they did, the ultimate disposition of the proceeds was no more probative of defendants' guilt of robbery than in a nongang context. This was not an apparently senseless crime that could be understood only by proof of gang rivalries or gang culture. Similarly, the robbers' intent to permanently deprive Sogomonyan of her expensive

16

necklace was a natural inference arising from the circumstances of the robbery. Gang evidence had no tendency to strengthen that inference.

Sogomonyan's identification of defendants as the robbers was somewhat strengthened by defendants' alleged membership in the same gang and clique of that gang. Notably, however, Jenks did not select the remaining photographs and did not testify about how they were chosen. There was thus no showing that the remaining six photographs were not of persons also affiliated with the Rollin' 40's gang. In any event, the mobile phone records linked Vance and Johnson with one another and with Melkonyan.

Most important, gang-related behavior was simply not a part of the charged offense. The robbers did not proclaim the name of their gang, make gang hand signs, or attempt to dissuade Sogomonyan from reporting the crime or testifying by threatening retaliation by other members of the gang. There is no evidence Sogomonyan knew or even had reason to suspect the robbers were gang members. Their clothing was not, apparently, indicative of gang membership. Sogomonyan simply described their clothing as black pants and black hooded sweatshirts, not red, blue, baggy, etc. Although Williams testified each defendant had tattoos signifying their gang affiliation, nothing in the record indicates Sogomonyan saw their tattoos—many of which would have been covered by their clothing—or recognized them as a sign of gang membership. Her description of the robbers did not include any mention of tattoos. The site of the crime was far from the territory claimed by the Rollin' 40's gang and there is no evidence the robbers told members of their gang about the crime. The only link between the robbery and a gang was defendants' alleged gang membership, yet even the prosecution's gang expert conceded gang members sometimes commit crimes for their own personal benefit.

Nor was the gang evidence probative because it would "help the People explain why [defendants] were in another place." While the commission of the crime within Los Angeles County was essential to the trial court's jurisdiction, and defendants' presence at the crime scene was essential to prove they were the robbers, an explanation for

17

defendants' presence outside their own neighborhood was neither required nor relevant. Defendants were not incarcerated at the time of the commission of this crime. They were as free to travel as any other person. Notably, no one suggested to the trial court that only gang members leave their own neighborhoods to commit crimes or only gang members would realize a robbery in a more affluent area would be more lucrative than a robbery in a less affluent area. Indeed, absent introduction of the gang evidence, with its inherent theme of territoriality, it is doubtful anyone would pause to wonder why defendants would be in Glendale.

In contrast to the minimal, tangential relevance, the risk of undue prejudice through introduction of the gang evidence in a unitary trial was extreme. To prove a gang enhancement, the prosecutor must introduce far more evidence than mere evidence of the defendant's membership in a gang. Proof of a gang enhancement includes evidence that the primary activities of that gang are the commission of particular crimes (such as robbery), that members of the gang have engaged in a pattern of criminal gang activity as illustrated by the felony convictions of other members of the gang, and aspects of gang culture supporting the specific intent and "for the benefit of" elements, which often include testimony regarding violence and intimidation. As previously noted, courts have recognized that gang evidence is inherently likely to inflame the jury.

In addition to the effects of public bias against, and fear of, gangs, the extensive, detailed gang evidence introduced to establish a gang enhancement creates a tremendous risk in a unitary trial that jurors will infer guilt of the substantive offense from the gang evidence, especially where the charged offense is one of the primary activities of the gang. In other words, there is a risk some jurors will infer the defendant must have committed the crime because his membership in a group that commits such crimes demonstrates his propensity to commit such crimes. Alternatively, jurors may use such a propensity inference to resolve doubts about the defendant's guilt. "An inference of a criminal disposition may not be used to establish any link in the chain of logic" leading to a finding of material fact. (*People v. Thompson* (1980) 27 Cal.3d 303, 317 (*Thompson*).)

18

Here, the weak, tangential relevance of gang evidence to the robbery charge was substantially outweighed by the risk of undue prejudice. Thus, the gang evidence would not have been admissible with respect to the robbery charge, and defendants clearly established that a unitary trial posed a substantial danger of prejudice. Accordingly, we conclude the trial court abused its discretion by denying the motion to bifurcate the gang enhancement.

**d. Refusal to bifurcate violated due process**

Defendants contend the error resulted in a violation of due process. We agree. The admission of evidence may violate due process if there is no permissible inference a jury may draw from the evidence. (*People v. Steele* (2002) 27 Cal.4th 1230, 1246; *Albarran, supra*, 149 Cal.App.4th at p. 229.) The relevant inquiry is whether admission of the evidence made the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

The refusal to bifurcate trial of the gang enhancement allowed the prosecutor to admit highly inflammatory gang evidence. The only permissible inference regarding the robbery that the jury could have drawn from any of the gang evidence was that Sogomonyan's identification may have been correct because she selected photographs of two people who allegedly belonged to the same gang and clique. However, there were no permissible inferences the jury could have drawn from the remaining gang evidence, and the jury was not told it could not draw a propensity inference from the gang evidence or otherwise consider that evidence with respect to defendants' guilt on the robbery charge.

The Attorney General argues that "it was never suggested that [defendants] could be found guilty because they were gang members or bad people" and notes that the prosecutor argued "it's not *just* that these men are gang-related that makes them guilty." (Italics added.) But propensity inferences arise without suggestion or encouragement; they are a "natural and inevitable" human tendency. (See *People v. Guerrero* (1976) 16 Cal.3d 719, 724 [propensity inference from admission of other crimes evidence].) In any

19

event, Williams's testimony about Vance's tattoo of a man with a money bag and a gun was phrased in excessively inflammatory terms, such as "gangster," "goon," and "goon squad" and succinctly described the propensity inference: "Usually they are known for robbing and stealing. That's what this indicates to me that he's affiliated that with that type of criminal activity."

In addition to the fear, bias, and propensity inferences inherent in the introduction of gang evidence, the gang evidence here was unusually detailed, especially regarding the predicate offenses, and it focused heavily on portraying members of the Rollin' 40's as having a propensity to commit robberies, even of their own allies.

Accordingly, because there were no permissible inferences the jury could draw from the vast majority of the gang evidence with respect to the robbery charge and that evidence created an extreme risk of undue prejudice, we conclude the trial court's denial of the motion to bifurcate with the resultant introduction of gang evidence in the unitary trial made the trial fundamentally unfair, in violation of defendants' federal due process rights.

### e.     Denial of the bifurcation motion was prejudicial

Because the error was of federal constitutional magnitude, the Attorney General has the burden of proving beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824].) In assessing the effect of the error, we examine the consequence of the admission of gang evidence at trial without reference to its relevance to the gang enhancement allegation. (Cf. *Albarran*, *supra*, 149 Cal.App.4th 214 [where trial court concluded gang enhancement was not supported by sufficient evidence, appellate court assessed effect of admission of gang evidence on trial of substantive offense, without regard to existence of gang enhancement].)

The critical factor in assessing prejudice in this case is Sogomonyan's identification of defendants. Although she consistently identified them and was certain of her identification at the preliminary hearing and at trial, she repeatedly told Jenks

20

when viewing photographs that she thought defendants were not the robbers, but the robbers looked like defendants. In addition, Sogomonyan offered to look at "the whole album" and declared, "[Y]ou know, once that face comes to me and it'll, it'll—like I'll recognize him." This statement clearly indicated she was not identifying defendants as the men who robbed her, but merely selecting their photographs as looking similar to the robbers. Sogomonyan's descriptions of the robbers to police were generic and matched defendants on the points of gender and race. Defendants were younger than Sogomonyan's age description of 24 to 27 years for each robber. Johnson was 19 at the time of the offense and Vance was 22. The record is insufficient to determine whether her descriptions matched defendants on the matters of physique, skin tone, facial hair, and nose size.

In addition, Pezdek's expert testimony regarding factors adversely affecting the accuracy of eyewitness identifications was highly relevant under the circumstances of this case. Virtually every factor to which Pezdek testified was applicable in this case. The robbery was apparently quite brief. The robbers snatched Sogomonyan's diamond necklace and took her mobile phone from her hand, but did not attempt to enforce their demands for her remaining jewelry or take the time to search her purse. Thus, the exposure time was limited. The presence of two robbers and the immediate aiming of a gun at Sogomonyan's head brought the distraction and weapon focus factors into play. Notably, Sogomonyan provided a detailed description of the gun, but generic descriptions of the robbers. Sogomonyan's ability to accurately identify the robbers was further complicated by both robbers' use of "disguises" (a hood and a do-rag), the cross-racial nature of the identification, and the extensive time delay—more than three months—between the robbery and the out-of-court identification procedure. Sogomonyan's testimony about the traumatic nature of the robbery established the applicability of Pezdek's testimony regarding the physiological effects of high stress on the body.

At least two aspects of the identification procedure were unfair, according to Pezdek's testimony: Jenks knew who the suspects were and he put both suspects' photos in the same set of eight he showed to Sogomonyan. During deliberations, the jury sent the court the following note: "Need testimony read for Andrew Jenks. Specifically did he know the two men suspected of the crime prior to showing [Sogomonyan] pictures of the suspects?" This indicated the jury gave serious consideration to Pezdek's testimony. We further note that a review of the transcript of the pretrial identification procedure indicates Jenks redirecting Sogomonyan's focus to Vance's photograph after she had selected it, but said, "I don't think that's him, but he looked like him." Redirecting her attention to a photograph of a person Jenks suspected of committing the crime could have provided implicit positive feedback to Sogomonyan, thus affecting the fairness of both the pretrial identification procedure and all subsequent identifications.

Sogomonyan's testimony also established the applicability of what Pezdek called the bias of an in-court identification and "source monitoring error." Sogomonyan admitted she was sitting in the courtroom when the defendants were brought in for the preliminary hearing and she knew "who was supposed to be coming into the courtroom at that time." Sogomonyan progressed from telling Jenks that defendants were not the robbers when she looked at their photographs to being "a hundred percent sure" they were the robbers once she saw them at the preliminary hearing and again at trial. Pezdek's testimony that late confidence had little correlation with accuracy was also pertinent to the progression of Sogomonyan's identifications.

Propensity inferences from the gang evidence served to diminish the weaknesses in the prosecution's case by showing that defendants were robbers and, given the presence of Johnson's phone in the general vicinity of the robbery, Sogomonyan's identification of defendants must have been correct, notwithstanding all the reasons to doubt its accuracy. Under the circumstances, we cannot conclude the Attorney General has proved beyond a reasonable doubt that the error did not contribute to the verdict. Accordingly, defendants' robbery convictions must be reversed.

22

**f.      Disposition moots credit issue**

Our disposition moots the issue Johnson raises about his pretrial credits.  If defendants are retried and again convicted of robbery, the trial court will recalculate their credits at that time.  If they are not retried, credits are irrelevant.

**2.      The evidence was insufficient to support the gang enhancement**

Defendants contend there was insufficient evidence to support a finding the robbery was committed for the benefit of, at the direction of, or in association with a criminal street gang, and thus the gang enhancement must be reversed for insufficient evidence.[4]  We agree.

**a.      Standard of review**

To resolve an issue of the sufficiency of evidence, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Tully* (2012) 54 Cal.4th 952, 1006.)  Substantial evidence is """"evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*Ibid.*)  We presume the existence of every fact supporting the judgment that the jury could reasonably have deduced from the evidence and make all reasonable inferences that support the judgment.  (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

Speculation is not evidence and cannot support a conviction.  (*People v. Waidla* (2000) 22 Cal.4th 690, 735; *People v. Marshall* (1997) 15 Cal.4th 1, 35.)  Similarly, evidence that merely raises a strong suspicion of guilt is insufficient to support a conviction.  (*Thompson*, *supra*, 27 Cal.3d at p. 324.)  A reasonable inference may not be based solely upon suspicion, imagination, speculation, supposition, surmise, conjecture, or guess work.  (*People v. Raley* (1992) 2 Cal.4th 870, 891.)  """"A finding of fact must be

---

[4] Although defendants' arguments seemingly apply also to the specific intent element of the enhancement, they do not challenge the sufficiency of evidence to support that element.

an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.""" (*Ibid.*)

**b.      Elements of gang enhancement**

Section 186.22, subdivision (b)(1) provides a sentence enhancement for anyone convicted of a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

The Legislature included the "for the benefit of, at the direction of, or in association with any criminal street gang" element to "make it 'clear that a criminal offense is subject to increased punishment under'" section 186.22, subdivision (b)(1), "'only if the crime is "gang related."'" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)  "Not every crime committed by gang members is related to a gang." (*Ibid*.) Thus, the charged offense itself, not just the defendants, must be gang related.

**c.      The evidence was insufficient to support a finding the robbery was committed for the benefit of a gang**

The facts of this case did not naturally give rise to any inference that the robbery was committed for the benefit of the gang.  It occurred far from the territory claimed by the gang, the victim was not a gang member, the robbers made no references to their gang during or after the robbery, gang members did not attempt to dissuade the victim from calling the police or testifying, there was no evidence the gang claimed responsibility for the crime, and there was no evidence the robbers informed their gang that they committed the crime or provided any portion of the proceeds of the robbery to the gang.  In addition, there was the substantial factor of Melkonyan's participation in the crime.  Little evidence regarding Melkonyan's role was presented at defendants' trial, but the prosecution told the jury in her opening statement "the crime was committed by the three men together," and the underlying theory seems to have been that Melkonyan drove defendants to the crime scene in his SUV and picked them up afterward.  There was no evidence or even a suggestion that Melkonyan was a member or associate of any gang.

24

The sole support for a finding that the robbery was committed for the benefit of the gang was Williams's expert testimony. In response to the prosecutor's hypothetical, which notably failed to include that the "third unknown person" was not a member of, or affiliated with, the gang, Williams also opined the crime would benefit the gang because the gang members were "gonna get respect," a "heinous crime" committed in "a smaller town or city" would be reported in the newspaper, and "[i]f the necklace was sold or traded it would benefit the gang because they could buy weapons or drugs for the gang and in turn use those to make more money."

There was no evidence that the defendants told their gang about the robbery or that the gang otherwise found out about it, which would be a prerequisite for defendants to "get respect" from their gang for commission of the offense. Nor was there any evidence the robbery received any news coverage or community attention at all, and in our modern environment it did not qualify as a particularly heinous crime. Given the absence of any reference to the gang during the robbery, neither news coverage nor community attention, if any occurred, would have mentioned a gang connection. Because the crime was committed far from the gang's territory, defendants made no references to the gang during the robbery, and there was no evidence anyone in the community knew about defendants' gang ties, there was no evidentiary basis for Williams's testimony that the gang's reputation would be enhanced by the commission of the robbery. Perhaps most important, there was no evidence that the gang received any portion of the proceeds from the sale or trade of Sogomonyan's necklace or phone. As Williams testified and the California Supreme Court recognized in *Albillar*, gang members sometimes commit crimes for their own personal benefit, and robbery is a type of crime that can obviously provide a personal pecuniary benefit to robbers. That robbery is, according to Williams, a primary activity of the Rollin' 40's gang does not mean that every robbery committed by one or more members of that gang is committed for the benefit of the gang. To so hold would contravene the intent of the Legislature that the *offense* to which the gang enhancement is attached be gang-related. The statute does

25

not provide, and no court has held, that the commission of one of a gang's primary activities by one or more gang members is, as a matter of law, for the benefit of the gang.

"Although it is true that the testimony of a single witness, including the testimony of an expert, may be sufficient to constitute substantial evidence [citation], when an expert bases his or her conclusion on factors that are 'speculative, remote or conjectural,' or on 'assumptions . . . not supported by the record,' the expert's opinion 'cannot rise to the dignity of substantial evidence' and a judgment based solely on that opinion 'must be reversed for lack of substantial evidence.'" (*Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180, 1191–1192.)  A gang expert's unsupported opinion "alone is insufficient to find an offense gang related.  [Citation.]  '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.'" (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.)  Because there was no evidentiary support for any of the purported ways in which Williams testified that the robbery would have benefited the gang, his opinion to that effect did not constitute substantial evidence. While it is possible defendants' participation in the robbery benefited the gang, Williams's testimony—supported by nothing more than his assumptions about the behavior of gang members—was insufficient to support a finding that the crime was committed for the benefit of a gang.

**d.      The evidence was insufficient to support a finding the robbery was committed in association with a gang**

Williams opined the crime was committed in association with a gang "because you have two individuals from the same gang linking up to do a crime."  The Attorney General argues that the crime was committed in association with a gang because both defendants belonged to the same gang, both had gang tattoos, and robbery was a primary activity of the gang.  Adopting either rationale would allow the greater punishment provided by section 186.22, subdivision (b)(1) to apply to any crime, even one that was

26

not gang related, so long as the perpetrators included two gang members with tattoos and a gang expert testified the crime committed was one of the gang's primary activities. This is not what the Legislature intended. (*Albillar, supra,* 51 Cal.4th at p. 60.) The pertinent element of the statute is "in association with any criminal street *gang*," (italics added) not in association with *members of* any criminal street gang.

In *Albillar*, three members of a gang forcibly raped a teenaged acquaintance who knew they were members of a gang. The victim initially refrained from reporting the crime because she feared the gang would come after her family. After she reported it, girlfriends of members of the gang made threatening phone calls to the victim and her family. (51 Cal.4th at pp. 51, 53.) The Supreme Court concluded the evidence was sufficient to support a finding that the crimes of forcible rape in concert and forcible sexual penetration were committed in association with a gang because "defendants' conduct exceeded that which was necessary to establish that the offenses were committed in concert. Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police and on the gang's reputation to ensure that the victim did not contact the police. We therefore find substantial evidence that defendants came together *as gang members* to attack Amanda M. and, thus, that they committed these crimes in association with the gang." (*Id.* at pp. 61–62.)

Here the evidence was insufficient to demonstrate that defendants "came together as gang members to" rob Sogomonyan. There was no evidence Sogomonyan knew defendants were gang members, they did not refer to their gang membership or make gang hand signs, and there was no evidence anyone relied upon the gang or its reputation to attempt to dissuade Sogomonyan from contacting the police or testifying against them. Although there may (or may not) have been a bond between defendants that had its origin in the gang, the involvement of, and reliance upon, a nongang accomplice greatly

27

diminishes, and perhaps dispels, any inference that reliance upon the gang's code of secrecy played any role in the commission of the robbery. It addition, it cannot be said that defendants' conduct in committing the robbery "exceeded that which was necessary" to accomplish the robbery.

The Attorney General relies upon *People v. Morales* (2003) 112 Cal.App.4th 1176, and *People v. Martinez* (2008) 158 Cal.App.4th 1324, which expressly relied upon *Morales*, for the proposition that the "in association with any criminal street gang" element is satisfied any time a defendant "knowingly" commits a crime with another gang member. The court in *Morales* stated, "Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang. Here, however, there was no evidence of this. Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members." (112 Cal.App.4th at p. 1198.)

Of course, the statutory language in question is "in association with any criminal street *gang*" (italics added), not "in association with gang members." The gang membership of accomplices in a crime undoubtedly is an important factor, but cannot alone be sufficient to establish that a crime was committed in association with a gang.

The proposition that accomplices' gang membership alone is sufficient to show the crime was committed "in association with any criminal street gang" was thus dubious even before *Albillar*, and must necessarily be rejected in light of the Supreme Court's reasoning in *Albillar*. The court in *Albillar* did not hold simply that the "in association with any criminal street gang" element was satisfied because the sex crimes were committed by three members of the same gang. The court instead examined the way in which the offense was committed, the way in which aspects of the offense provided evidentiary support for the gang expert's testimony, the victim's knowledge of the perpetrator's gang membership, her behavior reflecting her fear of gang retaliation if she reported the crime, and the gang's efforts after the crime to dissuade the victim from cooperating in a prosecution. If the mere gang membership of the perpetrators had been

28

sufficient to establish the "in association with any criminal street gang," the court would not have needed to engage in such a detailed and exacting analysis and would not have said, "Not every crime committed by gang members is related to a gang" (51 Cal.4th at p. 60) or explained that the perpetrators "came together *as gang members* to" commit the offenses (*id.* at p. 62, italics in original).

The significance of the final factor cited by the Attorney General, that robbery was one of the primary activities of the Rollin' 40's gang, is greatly diminished by the involvement of nongang member Melkonyan, the location of the robbery, the absence of any interjection of the gang into the commission of the robbery or its aftermath, and the absence of any evidence the gang was informed of the robbery or received any of its proceeds. Absent the gang membership of two of the three accomplices, nothing about this crime indicated it was gang-related.

Accordingly, we conclude substantial evidence did not support a finding the robbery was committed "in association with any criminal street gang." Thus, the gang enhancements must be reversed and cannot be retried.

### e. Issue regarding imposition of gang enhancement is moot

Reversal of the gang enhancements moots Johnson's contention the trial court abused its discretion by denying his request not to impose the gang enhancement.

## DISPOSITION

The judgments are reversed. The robbery charges may be retried, but the gang enhancements may not.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


ROTHSCHILD, Acting P. J.


CHANEY, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.